IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION

| | |
|---|---|
| **FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER OF COMMUNITY BANK OF WEST GEORGIA** | **CIVIL ACTION NO.** |
| **Plaintiff,** | |
| **v.** | **JURY TRIAL DEMANDED** |
| **RICHARD C. HAYDEN (nominally, to extent of insurance coverage only), DELMAS C. LINDSEY, DWAYNE H. MYRICK, W. KENNETH BLAIR, LORETTA M. GRIFFIN(nominally, to extent of insurance coverage only), ROBERT G. HARRIS, JR., R. BRYANT HIGHTOWER, JR., J. PAUL McWILLIAMS, MARK K. SCHREWS (nominally, to extent of insurance coverage only), H. BOYD STEPHENS, ROBYN S. WORLEY,** | |
| **Defendants** | |

## <u>COMPLAINT</u>

Plaintiff Federal Deposit Insurance Corporation ("FDIC"), as Receiver

("FDIC-R") for Community Bank of West Georgia ("CBWG" or "the Bank"),

states its Complaint against the Defendants, showing the Court as follows:

## I.   <u>INTRODUCTION</u>

1.  On June 26, 2009, CBWG was closed and the FDIC-R was appointed as receiver pursuant to 12 U.S.C. 1821(c).  At that time, the FDIC- R succeeded to all the rights, titles, and privileges of CBWG and its stockholders, account holders, and depositors.  12 U.S.C. 1821(d)(2)(A)(i).  Thereafter, the FDIC-R paid CBWG's depositors the value of their insured deposits, which totaled approximately $78.5 million.  The FDIC-R, by operation of law, is now subrogated to all rights of the depositors.  Pursuant to 12 U.S.C. § 1821(d)(11)(A), any recoveries that the FDIC makes, after administrative expenses, will be paid first to the depositors.

2.  FDIC-R herein asserts claims against three former CBWG officers (the "Officer Defendants"), to wit, Defendants Richard C. Hayden ("Hayden"), Delmas C. Lindsey ("Lindsey"), Dwayne H. Myrick ("Myrick"), and eight former directors (the "Director Defendants"), to wit, W. Kenneth Blair ("Blair"), Loretta M. Griffin ("Griffin"), Robert G. Harris, Jr. ("Harris"), R. Bryant Hightower, Jr. ("Hightower"),  J.  Paul  McWilliams  ("McWilliams"),  Mark  K.  Schrews ("Schrews"),  H.  Boyd  Stephens  ("Stephens"),  Robyn  S.  Worley  ("Worley"), (collectively  Hayden,  Lindsey,  Myrick,  Blair,  Griffin,  Harris,  Hightower, McWilliams, Schrews, Stephens, and Worley are referred to as the "Defendants") for  negligence  and  gross  negligence  in  operating  and  managing  the  lending

function of the Bank.  The FDIC-R seeks compensatory damages and other relief as a result of Defendants' tortious conduct (the "Damages").

3. Collectively, the Defendants were charged with, among other responsibilities, the responsibility of operating and managing the lending function of the Bank.  But rather than manage the Bank's lending function in a sound and reasonable manner, the Defendants took unreasonable risks with the Bank's loan portfolio, allowed irresponsible and unsustainable rapid asset growth concentrated in high-risk and speculative acquisition, development, and construction ("ADC") and commercial real estate ("CRE") loans and loan participations, disregarding regulator warnings regarding lending activities, violated the Bank's loan policies and procedures, and knowingly permitted poor underwriting in contravention of the Bank's policies and reasonable industry standards.

4. Each of the Defendants also routinely and regularly recommended and/or affirmatively voted to approve loans, purchase participations and other extensions of credit without adequately informing themselves of the relevant risks in connection with the approval of loans, failed to prevented violations of CBWG's loan policies, and failed to prevent the approval of loans they knew or should have known would likely cause the Bank to suffer substantial damages.

5. Among other problems, the Defendants approved the purchase of interests in a number of loans without CBWG having conducted its own independent underwriting of the loans.  Instead, the Defendants improperly approved these purchases based on at best outdated or inadequate underwriting by other institutions.

6. As described in detail below, the Defendants' negligence and gross negligence in their numerous, repeated, and obvious breaches and violations of the Bank's loan policy and procedures, underwriting requirements, banking regulations and prudent and sound banking practices are exemplified by 20 loans made between May 17, 2006 and October 3, 2007, which proximately caused Damages to the Bank of an amount to be proven at trial in excess of $16.8 million.

## II.    THE PARTIES

7. FDIC-R is an instrumentality of the United States of America, established under the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811-1833(e), with its principal place of business in Washington, D.C. 12 U.S.C. § 1821(d). As stated in paragraph 1, pursuant to 12 U.S.C. §§1821(c) and (d)(2)(A)(i), the FDIC-R is the successor to all the rights, titles, and privileges of CBWG and its stockholders, account holders, and depositors.

**A. Officer Defendants**

8.  Hayden[1] was the President, Chief Executive Officer ("CEO"), a director and a member of the Directors Loan Committee ("DLC") from March 12, 2003, until the Bank failed.

9.   Lindsey was the Chief Financial Officer ("CFO") and a director and and a member of the DLC from March 12, 2003, until he retired on May 7, 2008.

10.  Myrick was the Chief Credit Officer ("CCO") and a director from December 20, 2006, and a member of the DLC from June 21, 2006, until the Bank failed.

**B. Director Defendants**

11.  As described more specifically below, each of the Director Defendants was a member of the bank's DLC.

12. Blair was a director and a member of the DLC from March 12, 2003 until the Bank failed.

13.  Griffin was a member of the DLC from June 21, 2006 until the Bank failed.  She was a director from March 12, 2003 until the Bank failed.[2]

---

[1]    On March 8, 2010, Hayden filed Chapter 7 bankruptcy in the United States Bankruptcy Court for the Northern District of Georgia.  Pursuant to the Bankruptcy Court's Order of July 6, 2012, FDIC-R is permitted to maintain this action against him nominally and only to the extent of liability insurance.  FDIC-R does not seek to recover from the personal assets of Hayden.

14. Harris was a director and a member of the DLC from March 12, 2003 until the Bank failed.  He was the acting CFO from April 13, 2008 until June 26, 2009.

15. Hightower was a director and a member of the DLC from March 12, 2003 until the Bank failed.

16. McWilliams was a director from March 12, 2003 until the Bank failed.

17. Schrews[3] was a director from June 30, 2004 until the Bank failed.

18. Stephens was a director from March 12, 2003 until the Bank failed.

19. Worley was a director from March 12, 2003 until the Bank failed.

### III.   JURISDICTION AND VENUE

---

[2]     On May 16, 2012, Griffin filed for Chapter 7 bankruptcy in the United States Bankruptcy Court for the Northern District of Georgia.  Pursuant to the Bankruptcy Court's Order of November 15, 2012, FDIC-R is permitted to maintain this action against her nominally and only to the extent of liability insurance.   FDIC-R does not seek to recover from the personal assets of Griffin.

[3]     On July 16, 2010, Schrews filed for Chapter 7 bankruptcy in the United States Bankruptcy Court for the Northern District of Georgia.  Pursuant to the Bankruptcy Court's Order of July 12, 2012, FDIC-R is permitted to maintain this action against him nominally and only to the extent of liability insurance.   FDIC-R does not seek to recover from the personal assets of Schrews.

20.  This Court has subject matter jurisdiction over this case pursuant to 12 U.S.C. § 1819(b)(1) and (2); 12 U.S.C. § 1821(d) and (k); and 28 U.S.C. §§ 1331 and 1345.

21.  This Court has personal jurisdiction over the Defendants who at all relevant times were residents of, and conducted the business of the Bank, in the State of Georgia.

22.  Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the events and/or omissions giving rise to the claims and Damages asserted herein occurred in this district.

**IV.   FACTS**

23.  CBWG opened for business on March 25, 2003, as a state nonmember bank in Villa Rica, Georgia.  CBWG was wholly owned by its holding company, Community Bancshares of West Georgia, Inc. ("Bancshares").  On March 9, 2004, it became a Federal Reserve Bank ("FRB") member bank.  CBWG operated three branches in west and northwest Georgia.

**A.   The Bank's Lending Operations**

24. CBWG's initial business plan sought to increase the Bank's assets for a planned sale within five years of opening. To this end, CBWG focused on increasing the real estate lending, primarily ADC and CRE loans and loan participations.

25. Between 2004 and 2008, Defendants increased CBWG's ADC loan portfolio from 217% of total capital in 2004 to 420% of total capital as of December 31, 2008. The ADC component of the Bank's CRE portfolio more than tripled from 2005 to 2007, peaking at $83.1 million.

26. CRE and ADC loans are known to be more speculative than other types of loans because, among other reasons, of the lack of present cash flow source, uncertainties of development and sale, and the need for adequate secondary sources of repayment. Prudent lending in this segment of banking requires sound underwriting, timely evaluation and response to economic trends impacting the industry and strict adherence to prudent lending policies and standards, all of which the Defendants failed to do.

27. In over concentrating the Bank's loan portfolio in CRE and ADC loans, the Defendants also effectively disregarded CBWG's loan policy and prudent underwriting standards which recognized the need to closely monitor concentrations for adverse financial or economic conditions, stated that

concentrations would be limited, and established guidelines for concentrations based on the perceived risk.

28. Defendants knew or should have known concentrating a loan portfolio in ADC/CRE loans increases a bank's risk for numerous reasons, including:  (a) concentration in any sector of the economy increases risk resulting from that sector's downturn; (b) the housing market, in particular, is cyclical by nature; (c) the primary source of repayment is cash flow from the sale of the real estate collateral; and (d) historically, bank failure rates closely correlate with high ADC/CRE concentrations.  In short, concentrations of ADC/CRE loans in the volatile commercial real estate market render a bank vulnerable to changes in market conditions and require vigilant adherence to sound lending practices.  It is imperative that the known risks inherent in such high loan concentrations be managed by, at a minimum, management oversight, strategic planning, underwriting, risk assessment and monitoring of ADC/CRE loans, portfolio risk management, management information systems, market analysis, and stress testing.

29. The Defendants were regularly provided with information of key economic indicators, such as housing sales and home prices, which were used in the underwriting process.  Despite receiving information showing a slowing of

housing sales and peaking of home prices by early 2006, Defendants continued to approve high risk and speculative ADC and CRE loans, including the transactions which resulted in the Damages.

30. By 2007, the Bank suffered a significant decline in asset quality. Despite this decline in asset quality and increasing negative economic indicators, the Defendants continued to approve ADC and CRE loans, including a number of the loans that resulted in the Damages suffered by the Bank.

31. Further increasing CBWG's risk profile was the Defendants' decision to include a significant number of purchased participation loans in its loan portfolio.   Defendants were repeatedly warned regarding the extent of those participation loans and the lack of adequate risk management controls.

32. As CBWG's loan portfolio grew, the concentration of CRE and ADC loans to Total Capital increased the risk to the Bank and, as the quality of those loans deteriorated, CBWG's capital levels and earnings eroded.

33. Driven by their desire to rapidly grow and then sell the Bank, the Director Defendants and Myrick, among other things, exacerbated the Bank's risk exposure to CRE and ADC concentrations by purchasing loan participations without independent due diligence which allowed the Bank to rapidly grow at the cost of significant increased financial risk to the Bank.  In doing so, the Defendants

consciously disregarded its own loan policies and the financial risk in its desire to grow the Bank without adequate risk management controls.

34.  Between 2005 and 2007 the Defendants were repeatedly warned by regulators about, among other things: the Bank's high risk overconcentration in speculative ADC/CRE loans and weak risk management including weaknesses in underwriting, administration, and monitoring of CRE loans.  The Defendants failed to heed the regulators' warnings.

35.  The Bank's asset quality continued its steep decline in 2008 and 2009, significantly eroding its capital.   This was a significant factor which contributed to the Bank's failure.

36.  Due to the deficient underwriting, risk management, and credit administration allowed by the Defendants in approving CRE loans, CBWG was fatally exposed to the inevitable cyclical decrease in real estate values.  As real estate markets declined, the Bank's financial condition declined.

37.  On June 15, 2009, the CBWG Board of Directors made a written request to GDBF to close the Bank, admitting that they were not capable of managing it any further.  GDBF closed the Bank on June 26, 2009, and FDIC-R was appointed Receiver.

### B.     Loan Underwriting and Violations

38.    CBWG had specific written policies and procedures governing the underwriting, acquisition and administration of loans (the "Loan Policy").   The Loan Policy was intended to ensure that the Bank pursued prudent banking practices and to limit the Bank's risk exposure.    The relevant Loan Policy provisions include, but are not limited to:

1.   Residential construction loans require analysis of the financial strength of the borrower, including the borrower's current personal financial statements, current credit reports, most recent 2-years tax returns, and a global cash flow.

2.   Purchase of a loan participation requires analysis in accordance with CBWG's credit standards.  While the judgment of a lender from the selling bank may be considered it will not be relied upon.

3.   Loan-to-value ratio limits are 75 percent for commercial and pre-sale/contract residential construction loans; 70 percent for speculative residential construction loans; 75 percent for residential land and acquisition/development loans; and 65 percent for raw land loans.

4.   Guarantor creditworthiness, including verification of liquidity, must be verified prior to closing on all CRE loans.

5.   A complete appraisal prepared by a qualified appraiser in accordance with the Uniform Standards of Professional Appraisal Practice is required for each parcel of real property collateral before a final credit decision is made. The appraisal must be current – i.e., within six months of the loan closing.

6.   Land acquisition, development and lot purchase loans for the purpose of residential construction improvements shall only be

made to builders or developers with substantial financial strength and a proven track record.

7. All construction loans must be secured by a first priority lien position on the subject property being improved.

8. The Bank should decline "undesirable loans," which include loans to new businesses when repayment depends on the profitable operation or liquidation of the business.

9. An appropriate appraisal or evaluation must be received in sufficient time to be analyzed prior to final approval of a loan.

39. As detailed herein, the Bank suffered substantial damages from significant departures from safe and sound banking practices by the Defendants. Each of the Defendants repeatedly disregarded the Bank's Loan Policy and approved loans and loan participations involving borrowers who were not creditworthy and/or projects that provided insufficient collateral and guarantees for repayment. Defendants repeatedly engaged in a pattern and practice of approving loans and loan participation purchases that: 1) violated the Bank's Loan Policy, including, without limitation, the policy provisions in paragraph 38 above; 2) evidenced systematic deficiencies in the credit underwriting, approval, and administration process; and 3) violated sound and prudent banking practices including, but not limited to, the general safety and soundness and underwriting standards of 12 C.F.R. § 364.101, Appendix A, and the real estate lending standards of 12 C.F.R. § 365.2, Appendix A.

40.  Approvals of the transactions in Exhibit A attached, of which a number are briefly discussed below, illustrate, but are not exhaustive of, the types of failures, breaches, and violations of duty that each of the Defendants committed that damaged the Bank, and that constitute negligence and gross negligence either separately or together as a pattern or practice. (The loans and loan participations are described using initials for privacy reasons. The full names will be identified to the Defendants.)

41.  On May 17, 2006, Blair, Griffin, Harris, Hayden, Hightower, Lindsey, McWilliams, Myrick, Schrews, Stephens and Worley voted to approve a $689,000 loan to **TC**, the first of four loans made for the acquisition, development and construction of speculative homes in two subdivisions.  Approving this loan violated the Loan Policy, underwriting requirements, and safe and sound banking practices in at least the following respects: failure to analyze borrower's financial strength, even though it was clear from the credit memorandum presented to the DLC that TC had been dormant since 2003; failure to analyze guarantor's financial strength; and extending credit to a builder without proven experience or financial strength, as evidenced by the lack of building experience and weakened financial standing of guarantor.  The negligent and grossly negligent approval of the loan

resulted in substantial damages to the Bank and FDIC-R in an amount to be proved at trial.

42. On April 16, 2006, Blair, Griffin, Harris, Hayden, Hightower, Lindsey, McWilliams, Stephens and Worley approved a $2,250,000 loan to **LH** for the acquisition and development of 50 acres into 70 residential developed lots. Approving this loan violated the Loan Policy, underwriting requirements, and safe and sound banking practices in at least the following respects: the loan-to-value ratio at origination exceeded bank policy limits; failure to adequately assess the borrower's financial condition; failure to adequately assess the guarantor's liquidity; failure to properly value and secure collateral; and failure to obtain a qualified and timely appraisal. The negligent and grossly negligent approval of the loan resulted in substantial damages to the Bank and FDIC-R in an amount to be proved at trial.

43. On August 30, 2006, Blair, Griffin, Harris, Hayden, Hightower, Myrick, Schrews and Worley approved the purchase of $2,600,000 interest in a $11,739,000 residential acquisition and development loan to **VC**, originated by Flag Bank (now Royal Bank of Canada). The purpose of the loan was to finance land acquisition costs for 115 acres in Putnam County, Georgia and to develop a 50 acre portion of the property into 148 residential lots. Approving this loan violated

the Loan Policy, underwriting requirements, and safe and sound banking practices in at least the following respects: failure to review original appraisal on the collateral property; failure to conduct an independent analysis of the transaction and circumvention of the Bank's credit underwriting process, including lack of signed credit memorandum in the file or signed loan submission sheet; the loan-to-value ratio at origination exceeded bank policy limits; according to the date of the appraisal, the loan either closed without an appraisal or the appraisal was received with insufficient time for review; failure to verify the liquidity of the borrower or guarantor; failure to prepare a global cash flow analysis of the borrower; and failure to conduct a site visit of the collateral property, which was located outside of the Bank's trade area, prior to or after the initial loan closing as required by the Loan Policy.  The negligent and grossly negligent approval of the loan resulted in substantial damages to the Bank and FDIC-R in an amount to be proved at trial.

44.  On September 20, 2006, Blair, Griffin, Harris, Hayden, Hightower, Lindsey, McWilliams, Myrick, Schrews and Stephens approved a $938,000 loan to **BL** for the acquisition and development of two single family residences. Approving this loan violated the Loan Policy, underwriting requirements, and safe and sound banking practices in at least the following respects: the loan-to-value ratio exceeded bank policy limits; failure to adequately evaluate guarantor's global

cash flow and contingent debt; failure to verify guarantor liquidity; failure to conduct an analysis of a viable market for the subject homes; failure to properly calculate debt service ratio by basing calculation on 65% rather than 100% draw; failure to perform a visual inspection prior to loan advances; and requiring quarterly payments instead of monthly payments in violation of the Loan Policy. The negligent and grossly negligent approval of the loan resulted in substantial damages to the Bank and FDIC-R in an amount to be proved at trial.

45. On September 27, 2006, Blair, Griffin, Harris, Hayden, Hightower, Lindsey, and Myrick approved a $3,684,000 loan to **MH** for the construction of two single-family residences in Atlanta, Georgia and acquisition of residential lots for future construction. Approving this loan violated the Loan Policy, underwriting requirements, and safe and sound banking practices in at least the following respects: failure to visit the collateral property, prior to or after the initial loan closing in a timely manner; failure to verify guarantor net worth and liquidity; failure to adequately evaluate guarantor's global cash flow and contingent debt; the loan-to-value ratio at origination which exceeded bank policy limits; approval of loan despite the omission of pertinent details from the loan committee presentation; inadequate consideration given to real estate risk factors, such as how surrounding area affects property value; failure to incorporate debt covenants in the loan

documents to prevent the borrower from overleveraging its business; and failure to accurately grade loan.  The negligent and grossly negligent approval of the loan resulted in substantial damages to the Bank and FDIC-R in an amount to be proved at trial.

46.  On November 8, 2006, Blair, Griffin, Harris, Hayden, Lindsey and Schrews approved the request for the purchase of a $2,900,000 participation interest in a $12,412,500 acquisition and development loan originated by Fairfield Financial Services, Inc. for **BOJ.**  Approving this loan violated the Loan Policy, underwriting requirements, and safe and sound banking practices in at least the following respects: the Bank failed to perform independent underwriting of a purchased participation; no independent appraisals were obtained, and appraisal reviews were conducted by a bank employee with limited knowledge of the appraisal process; failure to properly analyze guarantor net worth and debt service capacity; failure to account for the fact that the borrower had no experience as a developer and had a low credit score; failure to perform a visual inspection prior to loan advances; failure to adequately consider and analyze the fact that a significant amount of the loan proceeds were budgeted for common-area improvements and artwork in areas of the development potentially outside the collateral property; failure to account for the fact that of the 15 lots closed in the five months prior to

loan origination, the lot with the highest purchase price of $1.25 million was purchased by guarantor; and failure to analyze or mention the cross-default provision of the development loan agreement with loans in which CBWG had no interest put the bank in an inferior position in that events not related to their collateral or loan could have negatively impacted the viability of the CBWG loan. The negligent and grossly negligent approval of the loan resulted in substantial damages to the Bank and FDIC-R in an amount to be proved at trial.

47.   On December 27, 2006, Blair, Griffin, Harris, Hightower, Lindsey, and Schrews voted to approve a $2,100,000 loan to **LL** for the acquisition and development of a 31.2 acre residential parcel in Dallas, Georgia.  Approving this loan violated the Loan Policy, underwriting requirements, and safe and sound banking practices in at least the following respects: failure to adequately review appraisal data, resulting in over-leveraging of the collateral properties; the loan-to-value ratio at origination exceeded bank policy limits; failure to complete an environmental checklist and obtain a Phase I environmental report in violation of the Bank's Loan Policy; failure to consider the effect of competing projects in development; and failure to verify the liquidity of the guarantor.  The negligent and grossly negligent approval of the loan resulted in substantial damages to the Bank and FDIC-R in an amount to be proved at trial.

48.  On March 14, 2007, Blair, Griffin, Harris, Hayden, Hightower, Lindsey, Myrick and Schrews approved the request for the purchase of a $3,000,000 participation interest in a $8,468,000 loan originated by First Coweta Bank of Newnan, Georgia for **SV** for the acquisition of a landfill, refinance of debt, purchase equipment, and to provide working capital.  Approving this loan violated the Loan Policy, underwriting requirements, and safe and sound banking practices in at least the following respects: the Bank failed to perform independent underwriting of a purchased participation; failure to adequately analyze the borrower's financial condition; disregard of information regarding the borrower's true financial condition; failure to adequately verify the liquidity of the borrower; approval of the loan with a large number of conditions thereby  relegating the approval process to the loan officer; financing a new business in violation of the Bank's Loan Policy; failure to understand the components of the collateral or the collateral's worth or location; and failure to conduct an appraisal review in violation of the Bank's Loan Policy.  The negligent and grossly negligent approval of the loan resulted in substantial damages to the Bank and FDIC-R in an amount to be proved at trial.

49.  On March 14, 2007, Blair, Griffin, Harris, Hayden, Hightower, Lindsey, Myrick and Schrews approved the request for the purchase of a

$3,000,000 participation interest in a $23,929,375 acquisition and development loan originated by Fairfield Financial Services, Inc., a division of Security Bank for **YL.**  Approving this loan violated the Loan Policy, underwriting requirements, and safe and sound banking practices in at least the following respects: failure to conduct proper independent due diligence prior to purchase of loan participation; inadequate appraisal review conducted by a Bank employee with limited knowledge of the loan and appraisal process; failure to prepare an adequate credit presentation that disclosed the material fact that the borrowers had acquired property in two phases; the loan amount exceeded the maximum loan-to-cost ratio; insufficient analysis of guarantor's creditworthiness with failure to verify liquidity or conduct analysis of global cash flow; failure to conduct a site visit to the collateral property, which located outside of the Bank's trade area, prior to or after the initial loan closing as required by the Loan Policy; and failure to maintain and protect the Bank's security interest in the collateral when the borrower and originating bank entered into a deed modification which cross-collateralized the loan with another loan and released 368 usable acres of collateral.  The negligent and grossly negligent approval of the loan resulted in substantial damages to the Bank and FDIC-R in an amount to be proved at trial.

50. On June 13, 2007, Blair, Griffin, Harris, Hayden, Hightower, Lindsey, and Myrick voted to approve a $2,100,000 million participation in a $3,697,000 residential acquisition and development loan originated by First Coweta to **FR**. The purpose of the loan was for the acquisition and development of 47 acres located in Opelika, Alabama. Approving this loan violated the Loan Policy, underwriting requirements, and safe and sound banking practices in at least the following respects: the Bank failed to perform independent underwriting of a purchased participation; failure to obtain independent inspection reports prior to funding advances; failure to analyze invoices sent by First Coweta in connection with the development budget, failure to ensure that the appraisals were in compliance with the Bank's loan policy; and approval of the loan by the Bank's Risk Management Officer who also served as the loan officer on the loan, with no separation of the credit risk management and loan origination functions. The negligent and grossly negligent approval of the loan resulted in substantial damages to the Bank and FDIC-R in an amount to be proved at trial.

51. On October 3, 2007, Blair, Griffin, Harris, Hayden, Hightower, Lindsey, Myrick and Schrews voted to approve a $2,600,000 loan to **AAS** to refinance its debt secured by a 340-unit self-storage facility located in Jasper, Georgia. Approving this loan violated the Loan Policy, underwriting requirements,

and safe and sound banking practices in at least the following respects: failure to obtain an appraisal report on the collateral prior to loan approval (and the post-approval appraisal report failed to meet minimum requirements of the Bank's Loan Policy because it was based on outdated market and employment information); insufficient collateral was available to secure the loan; documents supplied by the borrower indicated that the lease income on the collateral would not support the loan; failure to prepare a global cash flow analysis of the borrower; failure to prepare any analysis or projection of occupancy and lease income on the collateral; and failure to analyze or consider the repayment risk resulting from the borrower's $16.6 million in contingent liabilities shown in its financial statement. The negligent and grossly negligent approval of the loan resulted in substantial damages to the Bank and FDIC-R in an amount to be proved at trial.

52. Based upon the Defendants' negligent and grossly negligent conduct in connection with the foregoing transactions, FDIC-R has been harmed. With respect to each Defendant, as a result of that Defendant's negligence and gross negligence, FDIC-R seeks damages in at least the following amounts: Griffin – $16.802 million, Harris – $16.802 million, Blair – $16.722 million, Hayden – $15.734 million, Hightower – $14.772 million, Lindsey –$14.133 million, Myrick

–$13.022 million, Schrews – $13.101 million, Worley – $2.155 million, Stephens –

$1.061 million, and McWilliams – $1.061 million.

## V.    CAUSES OF ACTION

### COUNT I

### ORDINARY NEGLIGENCE UNDER GEORGIA LAW

53.   FDIC-R re-alleges and incorporates by reference each of the

allegations in paragraphs 1-52 of this Complaint as though fully set forth herein.

54.   Each of the Defendants owed CBWG a duty of care under common

law, O.C.G.A. §§ 7-1-490, 51-1-2, and other facets of Georgia law, to exercise the

diligence, care, and skill that ordinarily prudent persons would exercise under

similar circumstances in like position.   Also, each Defendant agreed and was

obligated by statute, contract and/or common law to diligently and honestly

administer the affairs of the Bank, and was under a duty to ensure that the Bank

operated in compliance with all laws, rules and regulations, as well as all

applicable rules and regulations of the Bank.   The Defendants, collectively and

individually, owed to the Bank the highest duty of due care and diligence in the

management and administration of the affairs of the Bank, in the use and

preservation of its assets and property, and in the adoption and carrying out of

banking practices that were safe, sound and prudent.

55.  Defendants are not entitled to the application of the business judgment rule because each of the Defendants' actions or inactions which are the basis of this negligence claim were taken without the Defendants being reasonably well-informed and in  bad faith and/or constitute an abuse of discretion because each of the Defendants ignored regulators' warnings regarding loan underwriting and risk management deficiencies, paragraph 34, repeatedly approved loans in violation of the Loan Policy and Parts 364 and 365 of the FDIC's Rules and Regulations, paragraphs 38-52, and by consciously exposing the Bank to undue risk by over concentrating in ADC/CRE loans and purchasing participations without adequate risk management controls, paragraphs 24-37, despite regulator warnings related thereto, paragraph 34.

56.  Defendant Hayden, as President and CEO, among other duties, was responsible for the overall management of the Bank including, but not limited to, ADC/CRE lending, and had the obligation to exercise the degree of diligence, care, and skill that ordinarily prudent persons in like positions would exercise under similar circumstances in management, oversight and conduct of the Bank's business.  These duties included, but were not limited to, ensuring that the Bank had adequate policies, procedures and internal controls relating to, among other things, ADC/CRE lending, that the Bank  followed  and complied with  its lending

and credit policies, loan approval process and loan and credit administration practices, that the Bank complied with banking statutes/regulations, that the Bank did not make imprudent loans and extensions of credit as part of a plan to unreasonably grow the Bank, that he approved loans that complied with the Bank's Loan Policy and prudent and sound lending practices, and that he managed and supervised the Bank's management team to ensure that they fulfilled their duties. Hayden in fact, possessed greater skill, knowledge, and intelligence in regards to banking practices and, as such, should be held to the standard of an ordinarily prudent person possessing these superior attributes.

57.    Defendant Lindsey, as CFO, among other duties, was responsible for the Bank's fiscal operations and overall profitability.  Defendant Lindsey had the obligation to exercise the degree of diligence, care, and skill that ordinarily prudent persons in like positions would exercise under similar circumstances in management, oversight and conduct of the Bank's fiscal policies and actions.  These duties included, but were not limited to, management of the Bank's assets and liabilities; implementation of the Bank's business plan; ensuring that in approving loans and the purchase of participations that the approvals and purchases of participations followed and complied with the Bank's lending and credit policies, loan approval process and loan and credit administration practices,

banking statutes/regulations and prudent and sound lending practices; and that he did not approve imprudent loans and extensions of credit as part of a plan to unreasonably grow the Bank.

58. Defendant Myrick, as CCO, among other duties, had complete responsibility for the Bank's loan portfolio, including ADC/CRE loans, and all lending activities, as well as credit/Loan Policy and administration and had the obligation to exercise a degree of diligence, care, and skill that ordinarily prudent persons in like positions would exercise under similar circumstances in management, oversight and conduct of the Bank's business. These duties included, but were not limited to, day-to-day oversight and administration of the Bank's loans, establishing internal loan controls and written policies and procedures for Board approval, ensuring the quality of the loan portfolio, monitoring the lending portfolio to ensure that staff operates in accordance with applicable laws and regulations, as well as the bank policies and procedures as approved by the Board of Directors, to work with the respective account officers, loan review and compliance to ensure that new and existing loans are properly documented and lien positions are appropriately perfected, and approving loans that the Bank adhered to its lending and credit policies, loan approval process and loan and credit administration practices, complied with banking

statutes/regulations and prudent and sound lending practices, and that the Bank did not make imprudent loans and extensions of credit as part of a plan to unreasonably grow the Bank.  Myrick, in fact, possessed greater skill, knowledge, and intelligence in regards to banking practices and, as such, should be held to the standard of an ordinarily prudent person possessing these superior attributes.

59.    By their actions and inactions, as described specifically and generally herein, Defendants Hayden, Lindsey and Myrick, as officers of the Bank, repeatedly failed and  on numerous occasions neglected to perform their respective duties with due care and diligence and took actions and made decisions without being reasonably informed and in disregard of  the risks, constituting bad faith and/or an abuse of discretion,  breaches of their statutory and common law duties of care, as follows:

a.  As to Defendant Hayden, his negligent and grossly negligent acts included, without limitation:

(i)     Disregarding the risks to the financial safety and soundness of the Bank  in pursuing an aggressive ADC/CRE lending strategy that placed short-term income and profits over compliance with the Bank's policies, banking statutes, and regulations, and prudent and sound lending practices;

(ii)    Failing to ensure that the Bank's ADC/CRE lending complied with the Bank's loan and credit administration policies and procedures, banking statutes and regulations, and prudent and sound lending practices;

(iii)   Failing to monitor and supervise subordinate officers and employees of the Bank with respect to ADC/CRE lending;

(iv)    Disregarding warnings of regulators and failing to take appropriate steps to address obvious problems, i.e., "red flags" with respect to the Bank's ADC/CRE lending, including underwriting, credit administration and risk management deficiencies;

(v)    Failing to ensure that ADC/CRE loans made by the Bank were safe, sound, and reasonable, and that the Bank had a reasonable prospect of being repaid by the debtors;

(vi)    Permitting the pursuit of an asset growth strategy based on an overconcentration of speculative, high risk, and poorly underwritten ADC/CRE loans;

(vii)   Failing to implement and follow sound loan underwriting and credit administration practices;

(viii)  Failing to implement prudent risk management strategies;

(ix)    Failing to follow the Bank's Loan Policy and failing to ensure that Bank management followed the Loan Policy;

(x)    Failing to properly supervise, manage, and oversee the Bank's loan operations; and

(xi)    Approving and/or ratifying loans and the purchase of loan participations that were made in violation of the Bank's Loan Policy, sound and prudent underwriting practices and/or had not been otherwise properly underwritten prior to funding as indicated in Exhibit A.

b. As to Defendant Lindsey, his negligent and grossly negligent acts included, without limitation:

(i)    Disregarding the risks to the financial safety and soundness of the Bank  in pursuing an aggressive ADC/CRE lending strategy that placed short-term income and profits over compliance with the Bank's policies, banking statutes, and regulations, and prudent and sound lending practices;

(ii)    Disregarding warnings of regulators and failing to take appropriate steps to address obvious problems, i.e., "red flags" with respect to the Bank's ADC/CRE lending, including underwriting, credit administration and risk management deficiencies

(iii)    Permitting the pursuit of a growth strategy based on an overconcentration of speculative, high risk, and poorly underwritten ADC/CRE loans;

(iv)    Failing to properly control and manage the Bank's risks;

(v)    Approving and/or ratifying loans and the purchase of loan participations that were made in violation of the Bank's Loan Policy, sound and prudent underwriting practices, and/or that had not been properly underwritten prior to funding as shown in Exhibit A.

c.  As to Defendant Myrick, his negligent and grossly negligent acts included, without limitation:

(i)    Disregarding the risks to the financial safety and soundness of the Bank  in pursuing an aggressive ADC/CRE lending strategy that placed short-term income and profits ahead of compliance with the Bank's policies, banking statutes, and regulations, and prudent and sound lending practices;

(ii)    Disregarding warnings of regulators and failing to take appropriate steps to address obvious problems, i.e., "red flags" with respect to the Bank's ADC/CRE lending, including underwriting, credit administration and risk management deficiencies;

(iii)   Failing to develop and implement sound lending practices, policies and plans;

(iv)   Failing to properly manage lending activities,, including ADC/CRE lending and loan portfolio;

(v)   Failing to ensure that staff  and the DLC  complied with the Bank's policies and procedures, banking statutes and regulations, and prudent and sound lending practices;

(vi)   Permitting the pursuit of a growth strategy based on an overconcentration of speculative, high risk, and poorly underwritten ADC/CRE loans;

(vii)   Failing to implement and follow sound Loan Policy and credit administration practices;

(viii)   Failing to properly control and manage the Bank's risks;

(ix)   Approving and/or ratifying loans and the purchase of loan participations that were made in violation of the Bank's Loan Policy and that had not been properly underwritten prior to funding as indicated in Exhibit A.

60.   In addition to the duties set forth in paragraph 54 above, the Director Defendants had the duty under Georgia law to ensure that the Bank's lending policies, banking regulations, prudent loan underwriting and credit

administration practices were followed and to take reasonably prudent steps to ensure that the Bank did not make imprudent loans or extensions of credit as part of a plan to unreasonably grow the Bank, and to exercise ordinary care and diligence in the administration of the affairs of the Bank, including, but not limited to, the following:

a.      Informing themselves about proposed loans and the risks the loans posed to the Bank before they approved them;

b.      Exercising independent judgment in connection with the review and approval or disapproval of loans;

c.      Confirming that any loans they approved were underwritten in a safe and sound manner;

d.      Ensuring that any loans they approved were secured by sufficiently valuable collateral and had sufficient repayment sources to prevent or minimize the risk of loss to the Bank;

e.      Not approving loans that exceeded the Bank's relevant concentration limits without adequate capital and other safeguards in place to mitigate the added risk of loss; and

f.      Ensuring that any loans approved did not violate applicable banking regulations.

61. By their common actions and inactions, as described specifically and generally herein, Defendants Blair, Griffin, Harris, Hightower, as directors of the Bank and members of the DLC and Defendants McWilliams, Schrews, Stephens and Worley as directors and members of the DLC (either in fact or by law) collectively repeatedly and on numerous occasions failed and neglected to perform their respective duties with due care and diligence and took actions and made decisions without being reasonably informed and without regard to the risks, constituting breaches of their statutory and common law duties of care, as follows:

a. Pursuing an aggressive ADC/CRE lending strategy that placed short-term income and profits ahead of compliance with the Bank's policies, banking statutes, and regulations, and prudent and sound lending practices;

b. Failing to ensure that the Bank's ADC/CRE lending complied with the Bank's policies and procedures, banking statutes, and regulations, and prudent and sound lending practices;

c. Failing to adequately monitor and supervise the officers and employees of the Bank with respect to ADC/CRE lending;

d. Disregarding warnings of regulators and failing to take appropriate steps to address obvious problems, i.e., "red flags" with respect to the

Bank's ADC/CRE lending, including underwriting, credit administration and risk management deficiencies;

       e.     Failing to inform themselves about the risks that the credit transactions posed to the Bank before they approved them;

       f.     Failing to exercise independent judgment in connection with the review and approval or disapproval of credit transactions;

       g.     Failing to ensure that ADC/CRE loans approved and/or ratified by the DLC were safe, sound, and reasonable, and that the Bank had a reasonable prospect of being repaid by the debtors;

       h.     Failing to confirm that the extensions of credit were underwritten in a safe and sound manner;

       i.     Failing to ensure that the credit transactions were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank;

       j.     Approving credit transactions that caused the Bank to exceed the Bank's relevant concentration limits;

       k.     Recklessly permitting the pursuit of a strategy based on an overconcentration of speculative, high risk, and poorly underwritten ADC/CRE loans;

l.      Failing to implement and require bank officers to follow sound loan underwriting and credit administration practices;

m.      Failing to implement and monitor prudent risk management strategies;

n.      Allowing officers of the Bank repeatedly to violate the Bank's loan policy, and approving and/or ratifying loans that were in material violations of the Bank's Loan Policy;

o.      Failing to properly supervise and oversee the Bank's loan operations; and

p.      Approving loans and loan participations which violated the Bank's Loan Policy and sound and prudent underwriting standards.

62.     With regard to each Director Defendant, the general acts of negligence and gross negligence applicable to each Director Defendant are set forth in paragraphs 24-37 and 61.  In addition, specific deficiencies and violations relating to the approval of illustrative loans which are applicable to each Defendant and identified within paragraphs 38-52.

63.     As a direct and proximate result of the Defendants' negligence, FDIC-R suffered compensatory damages in an amount to be proven at trial.

64. With respect to their negligent actions and inactions, Defendants pursued a common plan or design, or otherwise acted in a common or concerted manner, and therefore, each Defendant is jointly and severally liable for all Damages.

## COUNT II

## GROSS NEGLIGENCE CLAIMS UNDER 12 U.S.C. § 1821(k)

65. FDIC-R re-alleges and incorporates by reference each of the allegations in paragraphs 1-52 of this Complaint as though fully set forth herein.

66. Section 1821(k) of the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"), 12 U.S.C. § 1821(k), provides that directors and officers of failed financial institutions may be held liable to FDIC-R receiverships for loss or damage caused by their "gross negligence," as defined by applicable state law. Georgia law defines "gross negligence" as the absence of that degree of care which every man of common sense, however inattentive he may be, exercises under the same or similar circumstances.

67. In the alternative, the acts and omissions of each of the Defendants, described particularly in paragraphs 24-52 and 61 of this Complaint, and especially for Damages occurring after the Defendants were warned by regulators as set forth in paragraph 34, of overconcentration of ADC and CRE

loans, deficiencies in loan underwriting and credit administration, and deterioration of the housing market, which warnings were effectively ignored, demonstrate the failure to exercise that degree of care that every person of common sense, however inattentive that person may be, exercises under the same or similar circumstances, or lack of the diligence that even careless persons are accustomed to exercise.

68.   Each of the Defendants acted with gross negligence in operating the lending function of the Bank as follows:

a.   Defendant Hayden, by, among other things, engaging in a pattern and practice of repeatedly failing to follow and failing to require adherence to the loan approval process; disregarding regulators' warnings and criticisms regarding loan underwriting, risk management and loan concentrations, paragraph 34; failing to ensure that loans and loan participations were underwritten in a safe and sound manner; approving loan and credit extension transactions that failed to comply with the Bank's policy and safe and sound lending practices, paragraphs 38-52; allowing the Bank's loan portfolio to be over concentrated in speculative ADC/CRE loans in order to rapidly grow the Bank without adequate risk management controls, paragraphs 24-37; and signing off on loans when in fact the loans violated the Bank's Loan Policy and prudent underwriting standards, paragraphs 41-51.

b.     Defendant Lindsey, by among other things, engaging in a pattern and practice of repeatedly failing to follow the loan approval process; disregarding regulators' warnings, paragraph 34; and approving loan and credit extension transactions that failed to comply with the Bank's policy and safe and sound lending practices, paragraphs 38 to 52.

c.     Defendant Myrick, by among other things, pursuing a high risk, aggressive ADC/CRE loans strategy, failing to monitor key economic indicators and declines in asset quality, paragraphs 29-30 and 35, failing to heed regulators' warnings regarding the Bank's high risk in overconcentration in ADC/CRE loans, paragraph 34, and engaging in a pattern and practice of repeatedly failing to follow to the loan approval process, including approving loan and credit extension transactions that failed to comply with the Bank's policy and safe and sound lending practices, paragraphs 38-52, and allowing the Bank's loan portfolio to be overconcentrated in speculative ADC/CRE loans, paragraphs 24-37 and signing off on loans when in fact the loans violated the Bank's Loan Policy and prudent underwriting standards, paragraphs 41-51.

d.     Each Director Defendant as a member (in fact or by law) of the DLC, by and among other things, engaging in a common pattern and practice of: failing to conduct proper due diligence and to be reasonably well informed prior to

approving loans and loan participations;  failing to comply with the Bank's Loan Policy; disregarding regulators' warnings, paragraph 34; failing to ensure that loans and loan participations were underwritten in a safe and sound manner, paragraphs 38-52; allowing the Bank's loan portfolio to be over concentrated in speculative ADC/CRE loans, paragraphs 24-37.

69.    As a direct and proximate result of the Defendants' gross negligence, FDIC-R has suffered Damages in an amount to be proven at trial.

70.    With respect to their grossly negligent actions and inactions, the Defendants pursued a common plan or design, or otherwise acted in a common or concerted manner, and therefore, each Defendant is jointly and severally liable for all Damages.

## VII.   REQUEST FOR RELIEF

71.    Pursuant to Federal Rule of Civil Procedure 38, FDIC-R demands a trial by jury on all claims.

**WHEREFORE**, Plaintiff Federal Deposit Insurance Corporation, as Receiver for Community Bank of West Georgia, requests entry of judgment in its favor against Defendants as follows:

1.    For compensatory damages, jointly and severally, of at least $16.8 million and any excess amount to be proved a trial;

2.      For its costs of suit against all Defendants;

3.      For prejudgment and other appropriate interest pursuant to 12 U.S.C. § 1821(l); and

4.      Such other and further relief as the Court deems just and proper.

Respectfully submitted this 15th day of November, 2012.

SIMKINS HOLLIS LAW
GROUP, PC


/s/S. Paul Smith
Jeanne Simkins Hollis
Georgia Bar No. 646890
S. Paul Smith
Georgia Bar No. 663577
1924 Lenox Road, NE
Atlanta, GA  30306
(404) 474-2328 phone
(770) 587-0726 FAX
psmith@shlglaw.com
*Attorneys for the Federal Deposit
Insurance Corporation, as Receiver of
Community Bank of West Georgia*

## CERTIFICATION PURSUANT TO LOCAL RULES

Pursuant to the Local Rules this certifies that this document was prepared using the New Times Roman font in 14 point.  These font and point selections are approved by L.R.5.1.

<div style="margin-left: 40%;">

<u>/s/S. Paul Smith</u>
S. Paul Smith
Simkins Hollis Law Group, P.C.

</div>

| Transactions | | | | | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Borrower | Transaction Amount ($ millions) | Approval Date | Deficiencies* | Approval Votes | | | | | | | | | | | |
| | | | | Blair | Griffin | Harris | Hayden | Hightower | Lindsey | McW'ms | Myrick | Schrews | Stephens | Worley |
| 1. TC 1 | $0.689 | May 17, 2006 | 2,4,5 | x | x | x | x | x | x | x | x | x | x | x |
| 2. TC 2 | $2.149 | May 31, 2006 | 2,4,5 | x | x | x | x | x | | | x | x | x | |
| 3. TC 3 | $0.148 | June 20, 2007 | 2,4,5 | x | x | x | x | x | x | | | | | |
| 4. TC 4 | $0.080 | Feb. 20, 2008 | 2,4,5 | x | x | x | x | x | | x | x | x | x | x |
| 5. LH 1 | $2.250 | April 16, 2006 | 2-4,6,7 | x | x | x | x | x | x | x | | | x | x |
| 6. LH 2 | $0.190 | Sept. 6, 2006 | 2-4,6,7 | x | x | x | x | x | | | x | x | | |
| 7. LH 3 | $0.109 | June 20, 2007 | 2-4,6,7 | x | x | x | x | x | x | | x | | | |
| 8. LH 4 | $0.040 | Oct. 31, 2007 | 2-4,6,7 | x | x | x | x | x | x | | x | | | |
| 9. VC | $2.600 | Aug. 30, 2006 | 1,2-4,7 | x | x | x | x | x | | | x | x | | x |
| 10. BL 1 | $0.938 | Sept. 20, 2006 | 2-4 | x | x | x | x | x | x | x | x | x | x | |
| 11. BL 2 | $0.169 | June 6, 2007 | 2-4 | | x | x | x | | x | | x | | | |
| 12. BL 3 | $0.378 | Feb. 19, 2008 | 2-4 | x | x | x | x | x | | | | | | |
| 13. MH | $3.684 | Sept. 27, 2006 | 3,4 | x | x | x | x | x | x | | x | | | |
| 14. BOJ | $2.900 | Nov. 8, 2006 | 1,5,7 | x | x | x | x | | x | | | x | | |
| 15. LL 1 | $2.100 | Nov. 8, 2006 | 3,6,7 | x | x | | | | x | x | | x | | |
| 16. LL 2 | $0.405 | Mar. 7, 2007 | 3,6,7 | x | x | x | x | x | x | | x | | | |
| 17. SV | $3.000 | Mar. 14, 2007 | 1-5,7,8 | x | x | x | x | x | x | | x | x | | |
| 18. YL | $3.000 | Mar. 14, 2007 | 1,3,4,6,7 | x | x | x | x | x | x | | x | x | | |
| 19. FR | $2.100 | June 13, 2007 | 1,7 | x | x | x | x | x | x | | x | | | |
| 20. AAS | $2.600 | Oct. 3, 2007 | 2,4,6-8 | x | x | x | x | x | x | | x | x | | |
| **TOTAL** | **$29.529** | | | | | | | | | | | | | |

*Key to Deficiencies column in preceding table:
1 = purchased participation without conducting independent diligence
2 = failure to analyze borrower's financial strength
3 = allowed LTV limit exceeded
4 = failure to analyze guarantor's financial strength
5 = extension of credit to builder without proven experience or financial strength
6 = failure to properly value or secure collateral
7 = failure to obtain qualified and timely appraisal
8 = undesirable transaction-repayment depends on profitable business operations